IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:25-CR-00040 |
| JAMIE MORTON, | |
| *Defendant*. | |

## **JAMIE MORTON'S POSITION ON SENTENCING**

Jamie Morton stands before the court for sentencing as a 43-year-old first time felon. As the Court is aware, Ms. Morton entered a guilty plea to one count of bank fraud in violation of 18 U.S.C. § 1344 for misusing the proceeds of Paycheck Protection Program loans. As expressed in her letter to the Court,[1] Ms. Morton accepts full responsibility and is deeply remorseful for her criminal conduct. For purposes of sentencing under 18 U.S.C. § 3553(a), however, this crime must be viewed within the larger context of Ms. Morton's law-abiding life, including as a hardworking provider for her family. The positive impact Ms. Morton has had on those around her is clear when you review the many letters that friends, family, and colleagues have written to the Court. These letters clearly reflect the positive impact Ms. Morton has had on the community around her and the extent to which her family depends on her. In addition to supporting her son, Ms. Morton helps support her mother who is battling multiple sclerosis, cares for her niece during her sister's nursing shifts, and supports her brother in his fight against alcoholism.

---

1 Mr. Morton's letter to the Court is attached as Attachment 1.

Ms. Morton is deeply embarrassed and remorseful for her criminal conduct. The crime for which she will be sentenced stands in stark contrast to the law-abiding life she lives as an integral part of her family's support system.

Moving forward, Ms. Morton feels strongly about making amends and paying restitution. Ms. Morton's employment history shows that she is a hardworking woman who has managed to overcome a lifetime of obstacles. Although Ms. Morton lost her job with the government as a result of her guilty plea, she quickly obtained new employment with a company that is aware of the circumstances of her guilty plea. That job will allow her to continue to earn an income to support her loved ones and to make restitution in this case.

Ms. Morton respectfully asks this Court to fashion a sentence that will account for both the serious nature of her crime and the impact that incarceration would have on Ms. Morton's ability to support her son, elderly mother, niece, and brother and her ability to work and earn income to make restitution. For the reasons set forth herein, we respectfully submit that a non-custodial sentence is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in this case. To the extent that the Court requires a condition of home confinement, we ask that the condition allow Ms. Morton to continue to work and care for her mother, including allowing occasional travel to Florida to help her mother with medical appointments.

## I.      THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

Ms. Morton objected to the PSR's loss amount of more than $250,000, but less than $550,000. The parties, as part of the plea agreement, have stipulated to a lower loss of more than $150,000, but less than $250,000. Ms. Morton asks that the Court apply the parties' agreed upon loss amount.

Ms. Morton has also objected to the PSR not applying a two-level reduction to her total offense level as a Zero Point Offender under U.S.S.G § 4C1.1 because of a prior arrest from 2015 that resulted in Ms. Morton pleading *nolo contendere* to a drug possession count and receiving a 6-month diversionary sentence of probation before judgment, a form of diversion offered under Maryland law. We recognize that *United States v. Bagheri*, 999 F.2d 80, 83 (4th Cir. 1993) found that an earlier version of this Maryland law that allowed for probation without entry of judgment was counted for purposes a defendant's criminal history, even though the Maryland courts have never entered a formal judgment of conviction. *Bagheri* was decided prior to U.S.S.G. § 4C1.1, which went into effect November 1, 2023, and therefore the court would not have had to consider the disparate impact its decision would have on defendants, like Ms. Morton, who would otherwise qualify as Zero Point Offenders. Counting Ms. Morton's diverted, non-conviction from nearly 10 years ago as a conviction for guideline purposes overstates Ms. Morton's criminal history and deprives her the benefit that countless other defendants receive under U.S.S.G. § 4C1.1 for cases that may have similarly been diverted but pursuant to different statutory schemes that would not be counted under § 4C1.1.[2]

Using the parties' agreed upon loss and providing Ms. Morton with a two-level reduction as a Zero Point Offender, Ms. Morton has an Offense Level of 12 and a Criminal history Category of I, which together result in an advisory Sentencing Guidelines range of 10 to 16 months of incarceration. However, calculating the baseline advisory Guidelines range is only the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the

---

[2] Notably, probation before judgment, which is an incredibly favorable diversionary, non-conviction, resolution, is only available "when a defendant pleads guilty or nolo contendere or is found guilty of a crime. . ." Maryland Code 6-220.

baseline Guidelines range, the Court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*.

To the extent a two-level reduction under U.S.S.G. § 4C1.1 is not applicable, the Court should grant a two-level downward departure under U.S.S.G. § 4A1.3(b)(1) because, without credit as a Zero Point Offender, Ms. Morton's "criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." In fact, the Sentencing Guidelines' Application Note 3(a)(1) uses a defendant who "received criminal history points from a sentence for possession of marijuana for personal use, without an intent to sell or distribute it to another person" as an example of when a downward departure may be warranted.

Finally, once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether the circumstances and features of the case and the defendant before it warrant a variance from the Guidelines. *Id*. As set forth below, these factors further support a sentence of probation.

## II.    18 U.S.C. § 3553(a) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553(a) requires the sentencing court to consider the following factors (in addition to the advisory

4

Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to victim(s). 18 U.S.C. § 3553(a)(1)-(7). These statutory factors further support the requested sentence of probation.

### A. The Nature And Circumstances Of The Offense

The nature and circumstances of Ms. Morton's offense are addressed in the statement of facts included as part of the plea agreement and in the offense conduct portion of the PSR. Therefore, Ms. Morton only supplements the record briefly. While Ms. Morton misused a portion of the PPP loan proceeds on personal expenses, most of the loan proceeds went toward expenses related to her legitimate businesses. These PPP loans helped Ms. Morton's businesses stay afloat during the COVID-19 pandemic. Nevertheless, had the SBA known that Ms. Morton was going to misuse a portion of the PPP loan proceeds for personal expenses, it would not have granted the loan or loan forgiveness. Because of this, Ms. Morton has agreed to repay the total amount of four PPP loans as restitution in this case. While the fact that Ms. Morton used most of the loan proceeds on expenses related to legitimate businesses does not excuse her conduct, the nature of this crime is different than that of a defendant who relies on fake businesses to obtain PPP loans and then misuses the entirety of the fraudulently obtained money for luxury and other personal expenses.

### B. History And Characteristics Of The Defendant

Ms. Morton's personal history and characteristics support a non-custodial sentence. Ms. Morton's law-abiding life, including significant service to the federal government, and the central

role she plays in supporting her son, elderly mother, niece, and brother support a sentence of probation.

### i.    Ms. Morton's law-abiding life and career

Apart from the instant offense and a diverted misdemeanor drug possession offense from 2015, Ms. Morton has lived a law-abiding and honest life, including over eighteen years serving the federal government. Ms. Morton is extremely proud of her career and the opportunities she had to work for the United States government, but her life and career were not a foregone conclusion. She had to work hard and overcome obstacles to even obtain her GED.

Ms. Morton grew up surrounded by poverty, addiction, and hardship. Ms. Morton's father suffered from an addiction to crack cocaine and was largely absent from her childhood. As a child, Ms. Morton was only able to see her father once every few months when he was going through a period of sobriety or in recovery. As a result, Ms. Morton was primarily raised by her mother who worked as a housekeeper before becoming a paralegal. At a young age, Ms. Morton had to help raise her three siblings while her mother worked long hours to provide for them, a supporting role she maintains today. Ms. Morton dropped out of high school because of the birth of her son, but she persisted and obtained her GED while raising him. Now she is set to obtain her college degree in August.

Despite these challenges, Ms. Morton has always been able to find a way to provide for herself and her family. In high school, she worked for McDonald's. And after dropping out of high school, Ms. Morton worked for Marriot for several years before beginning her first of several jobs with the federal government. Over the next eighteen years, Ms. Morton was employed by or worked as a contractor for the Government Accountability Office, General Services

Administration, and Architect of the Capitol, Library of Congress, and other agencies in D.C. Government.

Although Ms. Morton has never been wealthy, she has always sought to give back to the community when she could. From 2017 to the present, Ms. Morton has tried to give back to those less fortunate than her through (1) providing food and supplies (including PPE during the Covid pandemic) to the homeless on New York Avenue NE, at K2 Park, and through various shelters; and (2) donating supplies to women in need through the YMCA since 2024. Mary Fletcher, a friend of Ms. Morton since Ms. Morton was a teen, writes:

> I have seen her volunteer countless hours at local shelters, where she coordinated food drives and assisted vulnerable populations, embodying a spirit of selflessness and community commitment. She has a unique ability to uplift those around her, often going out of her way to support friends in times of need, providing both emotional and practical assistance during trying times.

Consolidated character letters attached as Attachment 2.[3]

Ms. Morton's work ethic, compassion, integrity, and law-abiding character are clearly reflected in the letters written to the Court by individuals who know her best. Latarsha Folsom, who has worked for one of Ms. Morton's businesses writes:

> Under Jamie's leadership, Mortell has flourished into a reputable company known for its commitment to quality and customer satisfaction. Her hands-on approach and strategic vision have not only driven the company's growth but have also fostered a positive and inclusive workplace culture . . . . In addition to her professional accomplishments, Jamie is actively involved in community initiatives, reflecting her commitment to giving back and making a positive impact beyond her business endeavors.

As these letters reflect, Ms. Morton is a fundamentally honest, caring, and hardworking person who has positively impacted those around her. The anomalous bad act reflected in her

---

[3] We have included several excerpts of the letters in this sentencing memorandum. However, we encourage the Court to review the letters in their entirety.

criminal plea, while serious, should not overshadow Ms. Morton's otherwise law-abiding and honest life as the Court considers the appropriate sentence to impose.

        *i.*        *Ms. Morton's role as caretaker for her son, mother, and niece*

The Court should also consider the critical role Ms. Morton plays as caretaker for her twenty-two-year-old son and her elderly mother who is battling multiple sclerosis. This role is reflected in the letters her family wrote to the Court. Jarmel Cherry, Ms. Morton's son writes:

> She is the most important person in my life. One of my only sources of support, emotional security, and the reason that I'm even standing today . . . . My mom has helped me find new job leads, prepare for interviews, and focus on what my future may hold. She is the person who makes me continue looking forward when I want to keep looking back. If something were to happen to my mom, I'd honestly have no idea what to do next. Not only emotionally, that in itself would break me. But, financially, I do not earn enough money to support myself fully yet. I still have to rent a place, buy groceries, transportation, bills, etc. To be completely honest, I barely keep myself together now, even with her help. If I lost her, it would change everything, for the worse.

> Cherryl Morton, Ms. Morton's mother writes:

> Jamie is more than my daughter—she is my full-time caregiver, financial provider, and medical overseer. She ensures my medications are filled, and make sure that I have transportation to my appointments, communicates with my doctors, and monitors my health when I am too sick to do so myself. She has educated herself on how to manage my disease, and she advocates for me in ways no one else can. Living with MS is exhausting and, at times, terrifying. But Jamie's presence brings stability, safety, and hope into my life.

> Beyond her caregiving role, Jamie supports me financially. Because of my illness, I am unable to work. Jamie makes sure I have housing, food, utilities, and access to proper medical care. Without her, I fear I would be left without shelter or the ability to sustain myself. Her absence—whether temporary or long-term—would be devastating to my physical and mental health, and could very well result in homelessness and medical decline.

> The possibility of Jamie's incarceration would not only break my heart—it would severely endanger my health. Stress is a major trigger for MS flare-ups, and just the thought of losing Jamie sends my body into tension. These stress-induced attacks are painful and debilitating. I am terrified that the emotional and physical toll of her absence could leave me permanently damaged or worse.

Ms. Morton's vital role as a caretaker for her son and mother supports a probationary sentence. Section 5H1.6 of the Sentencing Guidelines (Policy Statement on "Family Ties and Responsibilities") recognizes the Court's discretion to grant a downward guidelines departure if the defendant's service of a sentence within the applicable guidelines range would cause a loss of essential caretaking or financial support to the defendant's family. The Court's focus should be on the "effect of the defendant's absence on [her] family members." *United States v. Schroeder*, 536 U.S. 746, 756 (7th Cir. 2008) (citing *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.").

Regarding the three non-exhaustive general considerations listed in Application Note 1(A) to the Policy Statement, including the "seriousness of the offense," we submit that while Ms. Morton's crime is serious, it is not serious to a degree that should preclude consideration of the impact that her absence would have on essential caretaking within her family. The remaining two considerations are inapplicable, as Ms. Morton's son, mother, and siblings were not involved in her offense and there was never any risk of danger to them as a result of the offense.

As for those factors expressed in Application Note 1(B), we submit that a sentence of incarceration would "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support" to Ms. Morton's mother and son. Ms. Morton physically, emotionally, and financially supports her entire family. We respectfully submit that the negative impact Ms. Morton's incarceration would have on her son and mother should strongly be considered as a basis for imposing a non-custodial sentence.

**C. The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense**

Ms. Morton acknowledges that she must suffer consequences for her criminal conduct. Under the sentencing guidelines we propose are appropriate for this case, Ms. Morton would be a Schedule C offender, where the sentencing guidelines support at least some portion of a sentence to be observed by something less than incarceration. *See* U.S.S.G. § 5C1.1(d)(2) (allowing for up to half of a sentence to be observed by home or community confinement). Probation is further supported by the mitigating circumstances of the important role Ms. Morton plays in supporting her 22-year-old son and elderly mother and her need to make restitution to the Government. The requested sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

**D. Afford Adequate Deterrence To Criminal Conduct And Protect The Public From Future Crimes Of The Defendant**

The public does not need any further protection from Ms. Morton, nor is there reason to believe she will reoffend. Ms. Morton appears to be at low risk of reoffending based on available empirical evidence. According to the United States Sentencing Commission, a Criminal history Category I offender over the age of 40, like Ms. Morton, has a historical general recidivism rate of 6.9%, which is the second lowest recidivist rate in the Commission's study.[4] Further, female Category I offenders have recidivism rates a third lower than males at all ages.

Moreover, Ms. Morton has already faced serious consequences for her conduct. She lost her former employment. Going forward, she will face all the stigma and consequences that

---

4 *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

accompany a felony conviction. Her family, many of her close friends, and members of the community are aware of these charges, and she is still coping with how to interact with the community. Ms. Morton is deeply ashamed and embarrassed about her conduct and of the impact it has had on those she loves. These consequences provide sufficient specific deterrence.

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct. The unique combination of motivation and circumstances that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[5] Indeed, available research suggests that the certainty of being caught and punished carries for greater deterrent effect than the severity of the punishment.[6]

In sum, a non-custodial sentence provides sufficient specific and general deterrence.

---

5 *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

6 *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 CRIMINOLOGY 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

### E. Policy Statements/Considerations

Congress's original directive to the Sentencing Commission to "ensure that the guidelines reflect the ***general appropriateness of imposing a sentence other than imprisonment*** in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense" supports a non-custodial sentence here. *See* 28 U.S.C. § 994(j) (emphasis added). Ms. Morton is a first-time felon, and this is not a crime of violence or an otherwise serious offense. A sentence other than imprisonment is appropriate here.

### F. The Need To Avoid Unwarranted Sentencing Disparity

A sentence of probation would not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Even reviewing cases involving false information in the loan application itself, higher sentencing guidelines, and other aggravating factors, there is support for a probationary sentence.

For example, in *United States v. McConnell*, 1:21-cr-00216-CCC (M.D. Penn. 2022) the defendant and her husband misused $244,292 from PPP loan proceeds for personal use, including spending $37,000 to purchase two vehicles and $195,300 towards purchasing a home. The defendant had an offense level of 13 (which provides a guideline range of 12 to 18 months). Nevertheless, the judge sentenced her to two years of probation. Likely relevant to the Judge's decision was the defendant's caretaking responsibility for her children.

Courts have also given probationary sentences in cases involving fraudulent applications and higher offense levels. In *United States v. Jenison*, 2:21-cr-00090-ALM (S.D. FL. 2021), the defendant submitted multiple PPP loan applications seeking $298,719. In support of these applications, the defendant created multiple false documents, including false bank account statements, false tax documentation, and corporation documentation with false dates.

12

Subsequently, the defendant made additional false claims about federal employment tax deposits. The defendant's bank ultimately approved two of the applications and transferred $160,247. The defendant had an offense level of 16 (which provides a guideline range of 21 to 27 months) and the Government requested 21 months of incarceration, the low end of her guideline range. Nevertheless, the judge sentenced her to five years of probation, including six months of home confinement.

The above cases show that a sentence of probation would fall in line with sentences imposed on similar, if not more serious, offenders.

### G.  The Need To Provide Restitution To Victims

The need to provide restitution to victims in this case supports a non-custodial sentence. Ms. Morton does not currently have sufficient assets to pay restitution, but she feels strongly about making amends and paying restitution for her crime. Since her plea agreement, Ms. Morton has been able to find new employment. Further, Ms. Morton has been able to secure several consulting positions that will help supplement her income. A non-custodial sentence will allow Ms. Morton to keep her new job and continue to make an income to pay restitution in this case, as well as support her son and mother.

### CONCLUSION

For the foregoing reasons and any other that may appear to the Court or that may develop at the sentencing hearing, Ms. Morton asks this Court to sentence her to a term of probation.

Respectfully submitted,

JAMIE MORTON,
By Counsel

/s/ Noah Cherry
Noah Cherry (VA Bar # 95726)
SCHERTLER ONORATO MEAD & SEARS, LLP

13

555 13th Street, NW
Suite 500 West
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ncherry@schertlerlaw.com

*Counsel for Jamie Morton*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2025, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ Noah Cherry _____<br>
Noah Cherry (VA Bar # 95726)